UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
ALAN LEVY,

<b><u>COMPLAINT</u></b>

       *Plaintiff*,

  -against-          **PLAINTIFF DEMANDS**
                     **TRIAL BY JURY**

THE BANK OF NEW YORK MELLON CORPORATION,

        *Defendant.*
------------------------------------------------------------------------------X

Plaintiff Alan Levy ("Levy"), as and for his Complaint, respectfully alleges, all upon information and belief, as follows:

<b><u>JURISDICTION AND VENUE</u></b>

1.  This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1332, in that Plaintiff's claims exceed the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

2.  Venue is proper under 28 U.S.C §1391(b) because the events underlying this action occurred within the Southern District of New York and because Defendant does business within the District.

<b><u>IDENTITY OF PARTIES</u></b>

3.  At all relevant times mentioned herein, Plaintiff Alan Levy, who is presently 59 years of age, was employed by Defendant The Bank of New York Mellon Corporation ("BNY") in the County, City and State of New York, until March 3, 2020 when his position was eliminated.

4.  Defendant BNY is a Delaware corporation with offices in the County, City and State of New York.

5.    Defendant BNY is a global investment company that provides investment management and investment services aimed at helping individuals and institutions invest, conduct business and transact in markets all over the world.

## BACKGROUND

6.    Plaintiff Alan Levy ("Levy") is an experienced equity and foreign currency derivatives trader with more than three decades of dedicated experience in that field.

7.    Levy's relationship with BNY began when Susquehanna Investment Group ("SIG"), his employer since 1997, asked Levy to participate in an on-going joint venture it had with BNY, which participation became effective in 2000.

8.    The joint venture ended in 2008 and Levy was offered a position working directly for BNY, which he accepted.

9.    Initially, Levy worked with Foreign Exchange Derivatives ("FX Derivatives"), as a Trader.

10.    In approximately 2010, Levy transitioned to working as a Trader with Equity Derivatives, after BNY lessened its FX Derivatives business, although Levy continued to price foreign currency options for one of the Bank's customers for a number of years thereafter.

11.    In late 2018, Levy was advised that BNY had decided to exit the Equity Derivatives business, which was expected to be concluded by April 2020, so that Levy's role as an Equity Trader would no longer be required.

12.    Levy, who desired to remain at BNY, began exploring other opportunities at BNY in early 2019, with the full knowledge and permission of his supervisor.

13.    In April 2019, two opportunities at BNY arose within days of each other, both of which were positions for which Levy was fully qualified and which he sought to fill.

2

14.     One position involved FX Derivatives in New York City and the other position was on an Equity Derivatives desk at Pershing, a BNY subsidiary, located in Lake Mary, Florida.

15.     Levy was not selected for either of these positions, which BNY made painfully clear was because of Levy's age.

16.     Levy would subsequently learn of a third opportunity in Lake Mary for which he also applied, but which Levy also did not obtain because of his age and/or his subsequent complaints of age discrimination.

**The FX Derivatives Position In New York, NY**

17.     In late April 2019, the head of FX Derivatives, Sam Osterman ("Osterman"), advised Levy he was leaving BNY and, at that time, Osterman asked Levy, on short notice, to temporarily fill the vacancy that would be left by his departure.

18.     Levy was clearly qualified for a position on the FX Derivatives desk, which business BNY had again focused on starting in 2017, since Levy had performed in that field for a number of years, including when he had initially joined BNY.

19.     In fact, Levy was so qualified that Osterman, who would soon be leaving BNY, told Levy that he had recommended that Levy permanently replace him as the head of the Desk.

20.     Levy was concerned about joining the FX Derivatives desk, however, because of the clearly hostile environment that the then CEO of BNY's Markets Division, Michelle Neal ("Neal"), had demonstrated towards older employees.

21.     Levy observed that Neal, who had joined BNY from Deutsche Bank in 2015, had purged the Division of capable and experienced middle-aged traders in favor of younger traders.

22.     Levy was 58 years old in April 2019.

3

23.     Additionally, Levy observed that Neal had brought a number of her younger, close Deutsche Bank colleagues with her to BNY, who joined with Neal in her discriminatory desire to elevate only younger employees.

24.     One of the employees that Neal had brought to BNY was Paul Matherne ("Matherne"), who was in his 40s, was Osterman's supervisor, and was based in London.

25.     Osterman actually confirmed to Levy that when he had recommended to Matherne that Levy permanently replace Osterman as head of the FX Derivatives desk due to Levy's extensive experience with FX Derivatives, Matherne was not receptive because, according to Matherne, Levy had **"been around the market for too long."**

26.     When Levy asked if that meant that Levy was "too old" for Matherne, Osterman responded, **"Let's just say that [Matherne] has 'preconceived notions' about you,"** which clearly confirmed that Levy's age played a role in how BNY viewed his future employment prospects.

27.     Levy began working on the FX Derivatives desk in early May 2019.

28.     Matherne made the temporary nature of Levy's role on the FX Derivatives desk known directly to him when, on a group call on Levy's first day on the desk, Matherne thanked Levy for "helping out" and stated, "It is good that we have a deep bench," which meant to Levy that Matherne only viewed Levy as temporary fill in and he would never be genuinely considered for a role.

29.     After that initial call, Matherne never interacted with Levy again, as Matherne preferred to speak with Levy's younger colleague, Kenneth Liu ("Liu"), who was in his 30's.

30.     The discriminatory environment that existed within Matherne's team was further confirmed when Levy heard Jang Kim ("Kim"), the Head Trader on the desk, who was in his early

40's, announce, **"What, is [salesperson] Tom Hoge in his 50's, maybe even 60? People that age should not be in this business."**

31.     Soon thereafter, Levy learned that Matherne had tasked Kim, who had expressed a clear bias against older employees, to assist him in hiring the individual who would permanently fill Osterman's position, which included providing Matherne with candidates.

32.     Given Levy's awareness that (i) Matherne believed that Levy had been in the business for "too long" and (ii) that Kim, the person charged with selecting candidates, felt that people Levy's age "are too old to be in this business," Levy reasonably concluded that his age of 58 would preclude him from even being considered for Osterman's role, though Levy decided that he would speak with Matherne directly about his interest in the position when Matherne was next in the New York office.

33.     Nevertheless, despite the fact that Levy did not formally apply for Osterman's role, it was well known that Levy was interested in obtaining the position, since Levy spoke with Osterman, Kim and Liu about his interest in the position.

34.     Further confirming that BNY was aware of Levy's interest in Osterman's position was the fact that Kim and Liu tried to hide the interviews of candidates from Levy, which included Kim and Liu hiding what Levy saw were resumes and Liu making the unbelievable excuse that he was "stepping out for a bit" when he was,  in actuality, conducting interviews in the conference room with Kim, which subterfuge would not have been necessary had they genuinely believed that Levy was not interested in the position.

35.     Levy was troubled by this lame effort to hide these interviews and expressed his frustration to Liu in or around the third week of May 2019, with Liu stating that he had "put in a good word" for Levy with Matherne, and when Levy asked about Matherne's reaction, Liu told

Levy that Matherne had "no reaction."

36.     On June 13, 2019, Matherne was in the New York Office and Levy had his first opportunity to speak with him in person about his interest Osterman's position.

37.     During the meeting, Matherine thanked Levy for "helping out," to which Levy said to Matherne, "If I can be honest, it is no secret that you are interviewing people outside of the firm for a permanent role and I am not being considered as a candidate.  I would like to be, so if at any point you change your mind, I would appreciate it."

38.     Matherne became visibly uncomfortable and said, "Thanks, again. I have to go to another meeting" and stood up to leave.

39.     Before Matherne left, Levy stated that he had thoughts on how to improve the business and said he would be happy to speak with Matherne about them, but Matherne said, "Sure, we should probably talk sometime, I have to go.  But thank you again for helping us out," and quickly left.

40.     Levy never heard back from Matherne, confirming that Matherne never genuinely considered Levy to be part of the team or a candidate for a permanent role, all of which was motivated by Matherne's discriminatory view that Levy's age precluded him from consideration.

**The Equity Derivatives Position At Pershing In Lake Mary, Florida**

41.     As set forth in ¶¶13-14 above, Levy also became aware of a position on the Equity Derivatives Desk at Pershing, LLC ("Pershing"), a BNY subsidiary, in Lake Mary, Florida, in April 2019.

42.     In late April 2019, Levy had a lengthy and productive telephone conversation with Terri Mayle ("Mayle"), the Manager of the Equity Derivatives desk at Pershing, during which call Mayle was clearly impressed with Levy's product knowledge and experience.

43.     At the end of the meeting, Mayle stated that she would be in New York in mid-May and she suggested that they meet at that time.

44.     On May 16, 2019, Levy met with Mayle in person in New York.

45.      Mayle emphasized how qualified Levy was, that he would be a great fit and that with his experience, he would be able to "just jump right in" and Mayle repeatedly described Levy as "plug and play," which Mayle said was because "you know the business so well."

46.     Mayle even went so far as to describe the working environment in the Lake Mary office, the commute and the excellent quality of life that existed in Florida as compared to New York.

47.     Finally, Mayle told Levy that the company would be flexible with his relocation, that he could start out working in New York but asked if he could be in Florida "by sometime in the Fall," which Levy assured her he could do.

48.     At the end of the meeting, Mayle advised Levy that he would have to go through the formality of applying when the job was ultimately posted.

49.     Before the meeting ended, Mayle strangely remarked that Claire Santaniello ("Santaniello"), Mayle's boss's boss was "fucking crazy.  Everyone hates her."

50.     Mayle also made it clear that to Levy that his age would play a role in his candidacy, saying, **"I'm not allowed to ask you this because it is age related, but Claire [Santaniello] is going to ask me about your age.  She is going to want to know how long you are going to continue to work."**

51.     Levy was taken aback and flustered by this inquiry and stated that he had no plans to retire any time soon, which was the truth.

7

52. Despite Mayle's upsetting age-related comment, Levy believed that he was a strong contender for the position, particularly because of Mayle's effusive and complimentary statements regarding Levy's experience and fit for the role, and also because she was discussing a potential start date.

53. The posting for the position was in late May/early June 2019 and Levy quickly submitted his application.

54. The posting described the position as requiring options experience, which Levy clearly had.

55. On June 24, 2019 Levy was shocked to receive an email from Mayle advising him that he was not getting the position because they were going to move someone over from another desk.

56. Levy learned that Brian Reschke, a younger white man with no genuine options experience, was selected for the position.

**Levy Complains to BNY's Human Resources Department About Age Discrimination**

57. By the end of June 2019, Levy, among other things, (i) had been denied a full-time role in New York because it was perceived that he had "been around the market for too long," (ii) had been told by Mayle that senior BNY decision-makers would want to ask about his age for a position in Florida "to know how long [Levy is] going to continue to work," and (iii) was also aware that other capable and competent employees in his age-bracket had been let go in FX Trading.

58. Levy, therefore, reasonably believed that he had been denied opportunities at BNY for which he was qualified because of his age, and decided to complain to BNY's Human Resources Department.

59.     On July 1, 2019, Levy met with Barbara Aurecchione ("Aurecchione"), the Global Head of Employee Relations, and relayed to her his experiences in applying for two positions and that it was clear to him that his age played a role in the positions being offered to younger candidates.

60.     Levy also told Aurecchione during the meeting about a recent conversation he had with a colleague about BNY's diversity training program, where the speaker mentioned that BNY had "too many 40 to 60 year old white men."

61.     Incredibly, Aurecchione responded, **"That happens to be true."**

62.     Levy was stunned by Aurecchione's statement and she continued, "Unfortunately, that's not good news for you, but that happens to be true," confirming that BNY condoned and permitted age to play a role in employment decisions.

63.     Levy told Aurecchione that her statement was discriminatory and that it did not help diversity to simply fire a number of middle-aged white men, particularly when Levy saw that a number of opportunities at BNY were being filled by white men, albeit younger, and Aurecchione nodded but did not respond.

64.     Levy also asked Aurecchione about Mayle asking him, **"Because of your age, how long are you planning on working?"** to which Aurecchione responded, **"That is a fair question."**

65.     Right before the meeting ended, and while Levy was aware that Aurecchione was not being particularly supportive of him, she asked Levy, "Ideally, what do you want out of this?"

66.     Levy responded that all he was looking for was to continue to work for the company and expressed his concern that he could find any position at all if he could not get these positions

for which he was qualified, stating, "I feel as if I have been blackballed from the company because the company is trying to get rid of people my age."

67.     Aurecchione promised that she would look into this, adding, "Even if it doesn't help you, perhaps we can prevent it in the future."

68.     The statements of Aurecchione – BNY's Global Head of Employee Relations – confirmed that BNY fosters and encourages a corporate culture that provides opportunities to younger employees and that BNY seeks to rid its workplace of older employees.

69.     Aurecchione said she would investigate and get back to Levy, though Levy knew that Aurecchione was not taking his complaint seriously.

**Levy Learns of Mayle's Discriminatory Bias**

70.     In early August 2019, Levy learned that when Mayle returned to Lake Mary after meeting with Levy on June 13, 2019, she was asked by a Pershing employee in Lake Mary whether she was going to hire Levy.

71.     Incredibly, Mayle said to the employee, **"Oh yeah, just what I need, another 58-year-old white male."**

72.     Levy was shocked to learn that, despite her positive statements during their meeting on June 13, 2019, Mayle had never truly considered him as a candidate for the first role because she dismissed him as "another 58-year-old white man," who she did not "need" or want.

73.     On the next business day, Monday, August 5, 2019, Levy met with Aurecchione, the Global Head of Employee Relations, with whom he had a previously scheduled meeting.

74.     Levy told Aurecchione about Mayle's ageist comments.

75.     Aurecchione appeared stunned and told Levy that, if true, that was "very serious," and she asked whether she could confirm this information, and Levy told her to by all means call the employee.

76.     Aurecchione confirmed that she had already spoken with Mayle, so that Mayle was clearly aware of Levy's complaint of age discrimination.

77.     Aurecchione, during this meeting, also told Levy about her investigation since July 1, 2019, regarding the FX Derivatives position in New York, and said that she had spoken with Matherne and Kim and concluded that the hiring process had been handled properly.

78.     Aurecchione said that it was her "opinion" that Levy "would have been a middle of the road" candidate and would not have gotten the job, even though she was not in a position to judge the qualifications of the candidates, and Aurecchione concluded that because of the hiring process at the company, the most qualified person gets the job.

79.     Levy responded that, if that was the case and BNY was a meritocracy, then Levy should have been assigned the Pershing position in Lake Mary, Florida, since the younger man who was selected for that role is not nearly as qualified as Levy and, in fact, few individuals in the entire bank were as experienced as Levy in equity derivatives.

80.     Levy again addressed the circumstances that showed that his age played a role in BNY's hiring decisions, to which Aurecchione again defended Mayle's questioning Levy about how long he intended to work, saying, **"That makes sense.  How do we know that you would just accept the job, the company pays your moving expenses, you stay on for a year or two and retire?"**

81.     Aurecchione's statements confirmed again that BNY did not view Levy as a qualified and experienced candidate for open positions, but as someone who was too old and too

11

close to retirement to be considered part of the Bank's future, despite his desire to continue contributing with no plans to retire at age 60.

**Levy Interviews For The Second Position In Lake Mary, Florida**

82.     On August 19, 2019, Levy interviewed for the second position in Lake Mary, Florida.

83.     Levy interviewed with Mayle and her boss, John Goodheart ("Goodheart"), but because Mayle was the hiring manager about whom he recently complained, Levy did not reasonably believe that he was genuinely being considered for the position.

84.     Goodheart emphasized that a Series 4 (Option Principal) license was required for the position.

85.     Levy responded that he had planned to take the Series 4 exam and, in fact, he had already purchased and completed reading a study guide on his own, was completing a few hundred practice questions and would be ready to take the exam shortly, which both Goodheart and Mayle conceded would be satisfactory.

86.     Furthermore, Goodheart offered to provide study materials to Levy if he got the position, confirming that the licensing exam could be taken after getting the position.

87.     During the interview, Goodheart and Mayle, expressed concern that they had lost two experienced people in two months and Mayle went on to state, "I don't know anything about options. John [Goodheart] does not know anything about options.  Brian, the new person on the desk, does not know anything about options."

88.     Mayle's acknowledgement to Levy confirmed that she hired someone unsuitable for the first Lake Mary position and that there was a lack of knowledge and experience in the business, which Levy could have clearly remedied.

89.     On September 3, 2019, Levy, having still not heard back from Aurecchione regarding his complaint of age discrimination from July 1, 2019, sent Aurecchione an email stating, "It has been about a month since we last spoke, and I was wondering if you had any updates regarding what we discussed on August 5th involving Terri and her comments."

90.     Levy also informed Aurecchione of his interview for the second Lake Mary position and expressed his concern about Mayle's input into the hiring, as he would be reporting directly to her, stating, "Obviously, she [Mayle] is aware of my concerns, as you told me you had a discussion with her."

91.     Aurecchione responded by telling Levy that BNY was conducting "a much greater review" because of the additional information he had provided that was "winding down this week," and that Aurecchione hope[d] to circle back with [Levy] by the end of this week."

92.     Levy never heard from Aurecchione again.

93.     Levy also never heard back about the second Lake Mary position, but in October 2019, learned that he had not been selected for the second Lake Mary position because he did not have his Series 4 license.

94.     This excuse for not hiring Levy was clear pretext, since Levy was advised that he could obtain the study materials and take the Series 4 test after he got the job and the person selected for the position, Warren Harvey did not have a Series 57 license, at the time of his hire, which is a required license that Levy possessed, and Harvey was given the opportunity to take the exam after starting his job, even though the license was a job requirement.

95.     Further, Levy was also aware that the individual who received the first Lake Mary position, Brian Reschke, was hired without a Series 4 license and, as of the filing of this Complaint still does not have it, confirming that Levy was denied the position not because he did not have a

13

Series 4 license, but because of his age and in retaliation for his complaints of age discrimination.

96.     Upon information and belief, Mayle was terminated in mid-October 2019.

97.     Due to BNY's practice of age discrimination that Aurecchione confirmed to Levy, the successful career that Levy enjoyed at BNY since 2008 has now come to end, not because of his abilities or lack of qualification for other roles, but because BNY perceives him as undesirable due to his age.

### AS FOR A FIRST CAUSE OF ACTION ON BEHALF OF LEVY AGAINST BNY FOR AGE DISCRIMINATION IN VIOLATION OF CHAPTER 1, TITLE 8, §8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

98.     Levy repeats, re-alleges and incorporates in full paragraphs 1 through 97 of this Complaint as though fully set forth at length herein.

99.     At the time Levy was subjected to the discriminatory conduct described herein, he was in a protected class under the New York City Human Rights Law because of his age.

100.     Throughout the time of his employment with BNY, Levy was fully qualified for his position and was in a position to continue working successfully and productively for the remainder of his career.

101.     BNY treated Levy less well because of his age and took adverse employment action against him as described herein, all of which was permitted and condoned by BNY, including Aurecchione, the Global Head of Employee Relations.

102.     The circumstances surrounding BNY's conduct toward Levy, including, and only by way of example, denying him employment opportunities for which he was qualified solely because of his age because BNY did not "need another 58 year old white male," gives rise to a very real inference that the actual basis for the BNY's actions against BNY were motivated by age discrimination.

14

103.    The aforementioned acts of BNY constitute unlawful discrimination against Levy

in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a)

(referred to herein as "The New York City Human Rights Law"), which provides, *inter alia* that:

> It shall be unlawful discriminatory practice . . .[f]or an employer or
> an employee or agent thereof, because of the actual or perceived age
> . . . of any person . . . to discharge from employment such person or
> to discriminate against such person in compensation or in terms,
> conditions or privileges of employment.

104.    As a result of BNY's violations of the New York City Human Rights Law §8-

107(1)(a), BNY is liable to Levy pursuant §8-502(a) of said statute for "damages, including

punitive damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's

fees," as provided for under the law.

105.    As a direct and proximate result of BNY's conduct complained of herein, Levy has

suffered damages, injuries and losses, both actual and prospective, which include financial loss,

damage to his career and emotional pain and suffering, so that Levy seeks in this First Cause of

Action compensatory damages in the amount of Three Million Dollars ($3,000,000).

106.    Here, BNY's conduct towards Levy shows that it acted with willful or wanton

negligence, or recklessness, or a conscious disregard of Levy's rights under the New York City

Human Rights Law, or that their unlawful actions against Levy were so reckless as to amount to a

disregard of Levy's rights, so that in addition to all the damages inflicted upon Levy and in addition

to all the measures of relief to which Levy may properly be entitled herein, BNY should

additionally be required to pay punitive damages as punishment for its discriminatory conduct in

the further amount of Five Million ($5,000,000) Dollars, in order to deter BNY and others similarly

situated from engaging in such conduct in the future.

107. Levy, therefore, seeks judgment against BNY on this First Cause of Action, for, among other things, for compensatory damages in the sum of Three Million Dollars ($3,000,000), and the additional further sum of Five Million Dollars ($5,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees on this cause of action, making a total claim of Eight Million Dollars ($8,000,000).

### AS FOR A SECOND CAUSE OF ACTION ON BEHALF OF LEVY AGAINST BNY FOR RETALIATION IN VIOLATION OF CHAPTER 1, TITLE 8, §8-107(7) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

108. Levy repeats, realleges and incorporates in full paragraphs 1 through 107 this Complaint, as though fully set forth at length herein.

109. Each time that Levy complained of the age discriminatory conduct to which he was subjected, he was engaged in a protected activity under the New York City Human Rights Law, of which BNY was aware.

110. As a proximate result of Levy engaging in protected activity under the New York City Human Rights Law, Levy suffered adverse employment action that was causally connected to his complaints of age discrimination, culminating in his not genuinely being considered for the second position that became available in the Lake Mary office reporting to Mayle, about whom he had complained.

111. BNY's unlawful conduct has adversely affected Levy's continued employment, his emotional well-being, the quality of his and his life's normal pursuits and Levy believes that the injuries inflicted upon him, which were a direct result of the occurrences complained of herein, have and will continue to cause Levy damage.

112.     The aforementioned acts of BNY constitute unlawful retaliation against Levy in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(7) of the New York City Human Rights Law, which provides, inter alia, that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . .

113.     As a direct and proximate result of BNY's violation of the New York City Human Rights Law, BNY is liable to Levy pursuant to §8-502 of said statute for "damages" and pursuant to §8-502(f) of said statute "for costs and reasonable attorney's fees," as provided for under the law.

114.     As a direct and proximate result of BNY's conduct complained of herein, Levy has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to his career and emotional pain and suffering, so that Levy seeks in this Second Cause of Action compensatory damages in the amount of Three Million Dollars ($3,000,000).

115.     Here, BNY's conduct towards Levy shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Levy's rights under the New York City Human Rights Law, or that their unlawful actions against Levy were so reckless as to amount to a disregard of Levy's rights, so that in addition to all the damages inflicted upon Levy and in addition to all the measures of relief to which Levy may properly be entitled herein, BNY should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Five Million ($5,000,000) Dollars, in order to deter BNY and others similarly situated from engaging in such conduct in the future.

116.    Levy, therefore, seeks judgment against BNY on this Second Cause of Action, including, among other things, for compensatory damages in the sum of Three Million Dollars ($3,000,000), and the additional further sum of Five Million Dollars ($5,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees on this cause of action, making a total claim of Eight Million Dollars ($8,000,000).

**WHEREFORE**, Levy demands judgment on the First Cause of Action against BNY in the sum of Three Million Dollars ($3,000,000) in compensatory damages and the further and additional sum of Five Million Dollars ($5,000,000) in punitive damages, for a total of Eight Million Dollars ($8,000,000); on the Second Cause of action against BNY in the sum of Three Million Dollars ($3,000,000) in compensatory damages and the further and additional sum of Five Million Dollars ($5,000,000) in punitive damages, for a total of Eight Million Dollars ($8,000,000); plus, for both causes of action, costs, pre-judgment interest and attorney's fees, and for such other relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
DAVIDA S. PERRY
BRIAN HELLER
3 Park Avenue, Suite 2700
New York, NY 10016
(212) 889-6565

18